UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

*****************************
Craig A. Marston, *
Plaintiff *
*
v. *
*
Metson Marine Services, Inc., *
Defendant *
*****************************

**COMPLAINT**
**(Jury Trial Requested)**

NOW COMES the plaintiff, Craig A. Marston, by and through his attorneys, and respectfully submits the within Complaint, stating as follows:

**I. Parties**

1. The plaintiff Craig A. Marston resides at 49A Stillings Court, Rochester, New Hampshire. Mr. Marston is African-American and a person of color.

2. The defendant, Metson Marine Services, Inc. (Metson) is a Nevada corporation with a principal place of business located at 2060 Knoll Drive, #100, Ventura, California. Metson has a place of business where Mr. Marston was employed at the Portsmouth Naval Shipyard, Building 238, Kittery, Maine.

**II. Jurisdiction and Venue**

3. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The Court has personal jurisdiction over the defendant because the defendant transacts business in Maine.

4. Venue is proper because a substantial part of the acts and omissions giving rise to this action occurred within this judicial district.

## III. Facts

5. Mr. Marston began his employment with Metson in or around May of 2024. Mr. Marston served as a deckhand throughout such employment.

6. In or around June of 2025, Mr. Marston obtained a merchant marine license from the U.S. Coast Guard authorizing him to operate vessels weighing no more than 100 tons. When Mr. Marston obtained the license, he provided a copy of it to Metson's project manager, Phill Oliver. Project Manager Oliver did not inform Mr. Marston at this time that Mr. Marston would need to satisfy any other requirements in order to operate the vessels that the merchant marine license authorized Mr. Marston to operate.

7. On or about August 11 or August 12 of 2025, Mr. Marston operated a U.S. Navy boat in connection with his employment duties, at the request of Chief Wade Eberhart of the U.S. Navy, for purposes of transporting personnel to a barge to conduct maintenance there. Mr. Marston's merchant marine license authorized him to operate the boat. Mr. Marston operated the U.S. Navy boat on this occasion at Chief Eberhart's direction without incident.

8. On or about August 15, 2025, at approximately 7:45 a.m., Chief Eberhart requested that Mr. Marston operate the U.S. Navy boat again, once more for the purpose of transporting personnel to a barge in order to conduct maintenance. Mr. Marston complied with the request.

9. At approximately 9:20 a.m. that morning, Mr. Marston received a call from Project Manager Oliver telling him to return the U.S. Navy boat to its berth and to report to Project Manager Oliver and Head of Operations Mike Jolley for a discussion. Mr. Marston returned the boat as directed.

10. Head of Operations Jolley informed Mr. Marston that he was grateful that Mr. Marston could operate the U.S. Navy boat, but that Mr. Marston required a “green light” from Metson in order to do so.

11. Mr. Marston then met with Project Manager Oliver, who informed Mr. Marston that he was not allowed to drive the U.S. Navy boat. Project Manager Oliver told Mr. Marston that there were “procedures in place” to become authorized to operate such a boat.

12. Mr. Marston replied that no one had ever told him about such alleged procedures and that he had not observed the alleged procedures applied to other employees. Mr. Marston further noted that Project Manager Oliver had witnessed Mr. Marston operating the U.S. Navy boat earlier in the week but had failed to inform Mr. Marston that Mr. Marston had violated any procedure.

13. Mr. Marston asked Project Manager Oliver whether Metson had received a copy of his merchant marine license authorizing him to drive boats such as the boat in question. Project Manager Oliver acknowledged that Metson had received a copy of the license.

14. Project Manager Oliver told Mr. Marston that if he did not like the rules he should quit. This marked the second time that Project Manager Oliver had recommended Mr. Marston quit, the first time having occurred in response to Mr. Marston raising safety concerns about boat handling.

15. Mr. Marston complained to Project Manager Oliver regarding lack of “equality.”

16. Moments after Project Manager Oliver’s contentious meeting with Mr. Marston in which the Project Manager told Mr. Marston that he should quit if he were unhappy, Project Manager Oliver wrote an e-mail to Metson’s Chief Administrative Officer Tessa Randopoulos characterizing Mr. Marston as “not suited for the environment” and “unpredictably aggressive.”

17. Mr. Marston's meeting with Project Manager Oliver made him frustrated at the discrimination to which he reasonably believed the Project Manager was subjecting him. Captain Ryan Jolley and Captain Troy Jenkins observed Mr. Marston's frustration and further observed him trying to contact Chief Administrative Officer Randopoulos as well as Metson's human resources personnel to report his concerns.

18. Captain Jolley and Captain Jenkins advised Mr. Marston to leave the workplace to allow the situation to "cool off," at around 10:20 a.m. on Friday, August 15, 2025.

19. Mr. Marston complied with the request to leave the workplace.

20. Chief Administrative Officer Randopoulos called Mr. Marston as he was leaving the employment premises. Ms. Randopoulos began reprimanding Mr. Marston when he informed her that he had driven the U.S. Navy boat, but Mr. Marston explained that he was licensed to drive such a boat. Mr. Marston emphasized to the Chief Administrative Officer that he had not known of any Metson procedures that his operation of the boat supposedly violated. Ms. Randopoulos stated that she had not known Mr. Marston had obtained the U.S. Coast Guard license authorizing him to operate the boat, contradicting the information Mr. Marston had received from Project Manager Oliver that he had submitted Mr. Marston's license to Metson.

21. Mr. Marston advised the Chief Administrative Officer that he felt he was being discriminated against as "the black guy."

22. The owner of the company, Thanasi Randopoulos, took the phone. Mr. Randopoulos asked Mr. Marston what he was rambling about and told him to "shut the f*** up." Mr. Marston protested that Mr. Randopoulos could not talk to him that way. Mr. Randopoulos told Mr. Marston that he could talk to him any "f***king" way he wanted.

23. Mr. Marston then contacted Metson's Human Resources official, Stuart Birdsey—also on August 15, 2025—to report that he believed Metson was subjecting him to race discrimination.

24. Metson company policies state that "it will immediately undertake a fair, timely, thorough, and objective investigation" of reports of employment discrimination made to the company. Metson company policies further state that, "Upon completion of the investigation, the HR Department will report the findings and conclusions to the [complaining] employee."

25. Metson undertook no such investigation of Mr. Marston's reports of race discrimination, nor did Metson report the findings or conclusions of any such investigation to Mr. Marston.

26. Metson fired Mr. Marston on Monday, August 18, 2025, ostensibly for "voluntary job abandonment," despite the fact that Metson knew that Mr. Marston had only left the workplace on August 15, 2025, because **Metson *asked* him to leave** to allow for a cooling-off period.

27. Mr. Marston timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC) alleging race discrimination and retaliation.

28. Mr. Marston requested a Notice of Right to Sue from the EEOC and received such Notice on June 16, 2026. This lawsuit is filed within 90 days of Mr. Marston's receipt of the Notice of Right to Sue, as required.

**COUNT I**

**(Violation of Title VII—Race Discrimination)**

29. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

30. Mr. Marston is an African-American and therefore belongs to a protected class.

31. Mr. Marston was qualified for his position as a deckhand.

32. The defendant discriminated against Mr. Marston based on his race, doing such things as disciplining him for alleged violation of policies about which Metson never informed Mr. Marston, subjecting him to differential treatment as compared with the company's treatment of Caucasian employees and employees not identifying as African-American, recommending that Mr. Marston quit when he complained of race discrimination, describing Mr. Marston in racially stereotypical terms such as "unpredictably aggressive" and "not suited for this environment," and firing Mr. Marston for plainly pretextual reasons—specifically that he somehow voluntarily abandoned his employment when in fact Metson asked him to leave work for the day after the contentious meeting with Project Manager Oliver in which Mr. Marston alleged race discrimination.

33. As a direct and proximate result of the defendant's race discrimination, the plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life.

34. The plaintiff is entitled to punitive damages based on the defendant's malice and the defendant's conduct in reckless disregard of the plaintiff's federally protected rights.

35. The plaintiff is entitled to his reasonable attorney's fees, plus interest and costs.

**COUNT II**

**(Violation of Title VII and RSA 354-A—Retaliation)**

36. The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

37. The plaintiff engaged in protected activity, reporting to Metson his reasonable belief that Metson was subjecting him to race discrimination.

38. The defendant subjected Mr. Marston to adverse employment actions causally connected to Mr. Marston's protected activities, firing him the next business day after he engaged in the protected activities for plainly pretextual reasons.

39. As a direct and proximate result of the defendant's retaliation, the plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life.

40. The plaintiff is entitled to punitive damages based on the defendant's malice and the defendant's conduct in reckless disregard of the plaintiff's federally protected rights.

41. The plaintiff is entitled to his reasonable attorney's fees, plus interest and costs.

WHEREFORE, the plaintiff Craig Marston respectfully prays this Honorable Court:

A. Schedule this matter for trial by jury, and after trial;

B. Find the defendant liable for race discrimination in violation of Title VII;

C. Find the defendant liable for retaliation in violation of Title VII;

D. Award the plaintiff damages for lost wages, lost earning capacity, and lost employment benefits;

E. Award the plaintiff compensatory damages for emotional distress, humiliation, inconvenience and loss of enjoyment of life;

F. Award the plaintiff punitive damages;

G. Award the plaintiff his reasonable attorney's fees;

H. Award the plaintiff interest and costs; and

I. Grant such other and further relief as is just and equitable.

Respectfully submitted,
CRAIG A. MARSTON
By his attorneys,
MAINE EMPLOYEE RIGHTS GROUP

Date: September 14, 2026

By: /s/ Chad Hansen

Chad Hansen, ME Bar #9489
92 Exchange Street
Portland, ME 04101
(207) 874-0905
chad@employeerightslaw.attorney